# STATE v. MORRIS
(No. 1570; Dec. 17, 1929; 283 Pac. 406)

For the appellant there was a brief and oral argument by *T. S. Taliaferro, Jr., Arthur-Lee Taliaferro,* and *Joseph A. Galicich,* of Rock Springs, Wyoming.

For the respondent there was a brief by *Wm. O. Wilson,* Attorney General; *J. A. Greenwood,* Deputy Attorney General, and *Richard J. Jackson,* Assistant Attorney General, and oral argument by *Mr. Jackson* and *Mr. Muir,* County and Prosecuting Attorney of Sweetwater County.

RINER, Justice.

Upon an information filed in the District Court of Sweetwater County by the proper officer on November 9th, 1928, Henry B. Morris, appellant herein, was tried and convicted of murder in the first degree. The jury failed to add to the verdict the words "without capital punishment" and accordingly judgment was entered sentencing Morris to suffer the penalty of death. The record is before us by direct appeal for review.

The trial was had more than four years after the commission of the alleged crime and the evidence is wholly circumstantial. The facts in the case, as developed on the witness stand, are substantially these:

In the year 1924 there were three sisters living in Denver, Colorado. Two of them, Mae Griffiths and Maude Welsh, were residing there with their husbands. The third sister, Anna, when about seventeen years old, had married a man by the name of Rowland; from him she had separated, after they had lived together between one and two years. Subsequently she again married a man by the name of Grabe, with whom she lived for about sixteen years, and by whom she had five children, one of whom, previous to 1924, had died. The oldest child, a boy, had

been born in Rock Springs, Wyoming, where the Grabes lived for some time. Of these children who were living in the year 1924, one, a girl, Geneva Grabe, was born in Denver, February 14, 1921. Sometime before the month of June 1924, Anna Grabe left her second husband and went to reside a part of the time at the home of her sister Mrs. Griffiths. The husband and the rest of the children continued to occupy the family home in Denver. Mrs. Grabe, meanwhile, occasionally worked as housekeeper for other people. It appears that at one time she kept house on a ranch for a man by the name of George Tomlin, whose wife had left him and who wanted Mrs. Grabe to marry him. Apparently, also, Mrs. Grabe had other masculine friends who interested themselves in her behalf, among them being a Charles or George Lyman, and one George Cummings, to be hereafter mentioned.

In June 1924, by correspondence arising out of a newspaper advertisement, Mrs. Grabe, at that time thirty-six years old, under the name Anna Rowland, wrote to one George W. Morrison, at Rock Springs, Wyoming, concerning the position of housekeeper in the latter's home. Morrison's wife had died sometime previously, leaving him with a family of three minor children to be cared for, the youngest an infant only three weeks old at the time of the mother's death. Mrs. Rowland, after first advising Morrison that she would come, again wrote him that she could not come and that she was making arrangements to go elsewhere.

The latter part of June, 1924, taking with her her child Geneva, Mrs. Rowland left Denver in an auto with the Mr. Lyman already referred to, her destination being Wheatland, Wyoming. Thereafter Morrison received another letter from her addressed from Wheatland, stating that she had had a disagreement and would not continue on with the parties with whom she went to that place, and asking if she could not come immediately to Rock

Springs, Wyoming. Without waiting for Morrison's reply, she appeared at his house in that place on or about the evening of July 7, 1924. She was then employed by him as housekeeper in the home at a salary of $1 a day or $30 a month, and she undertook her duties in that capacity about two days later, after a Mr. and Mrs. Priddy, who had previously rented a room from Morrison, moved out.

Henry B. Morris, an employee of a powder company in Carthage, Missouri, at the instance of that company, moved with his family to Utah in 1915, and engaged in the operation of its powder plant in that state. The family remained there until July, 1919, when Morris left and came to Wyoming, ultimately finding work in one of the mines of the Union Pacific Coal Company at Rock Springs. In the latter part of September or the first part of October of that year, he moved his family to the last mentioned place. When Morris commenced work in Wyoming he did so under the name George W. Morrison. His reason for so doing being—as he testified—to avoid having his wages garnisheed on account of debts that he had incurred in Utah, to the extent of over $2,000, through hospital and doctor bills for his eldest daughter, who had undergone three surgical operations. By 1922, with the aid of his father in Missouri, Morrison was able to pay off these debts.

On account of a strike affecting working conditions in Rock Springs, he moved his family back to Carthage, Missouri, leaving Wyoming at that time the night of April 15, 1922. The family remained there until October of that year, when they returned to Rock Springs and he again resumed work in the mines under the name of George W. Morrison. In March, 1923, the family moved into the house known as 614 Eleventh Street or by the coal company number—as it was owned by that company—of 253. In February, 1924, Mr. and Mrs. Priddy, before mentioned, rented a room in the house. Sometime during that month

or the March following, Morris' wife died, as already stated, leaving three children in the home. The eldest daughter had meanwhile been married and was then living on Eleventh Street half a block east from her father's house. The ages of the other children at that time were respectively fourteen years for the boy, eleven years for the girl, and the baby three weeks. Mrs. Priddy and some of the neighbors cared for the children after the mother's death and until Mrs. Rowland arrived.

This house in which the Morris family was then living was a one story frame structure, which faced north on Eleventh Street. At the rear of the building was a single door and west of it was the entrance into the cellar of the house. There appears to have been no entrance to the cellar except from the outside. The cellar door of wood was set in its frame sloping up towards the house, so as to open and turn over to the west. A flight of six or seven wooden steps led to the cellar floor, which was of dirt. The excavation itself was about eight or ten feet square and about six feet deep from floor to ceiling. The sides of the cellar were kept in place by means of boards and props, reaching from the floor to the ceiling. These boards on the sides extended below the dirt floor of the cellar about six inches. There was a driveway or alley south of the house that was used as a road by the public as they chose. The lot could be crossed by anyone within a few feet of the door of the house, as Morris testified. He also stated that he never used the cellar for anything but kindling boxes and barrels, old clothing and occasionally canned food stuffs—such as condensed milk for the baby. He had boxes nailed up to the wall to hold these canned goods. He frequently went to the cellar day and night to get the milk.

Concerning the relations existing between Morris and Mrs. Rowland during the time she was housekeeper there, he testified that they had no trouble of any kind or char-

acter, no disagreement, no dispute, or ill feeling whatever; that he paid her her wages for the twenty-eight or twenty-nine days she was in his home. A close neighbor, when asked on the witness stand: "Do you know of their having trouble in any way?" responded: "None whatever." This neighbor's wife, who seems to have become well acquainted with Mrs. Rowland, also testified that the latter never at any time told her that she (Mrs. Rowland) and Morrison had had any trouble about her pay; this witness also said that Mrs. Rowland told her that Morris wanted to marry her. No one testified in contradiction of Morris' description of the amicable relations existing between himself and the housekeeper.

Sometime after commencing her duties at the Morris home, Mrs. Rowland told him that she was dissatisfied in Rock Springs and would only remain the four weeks or the month. Morris testified that she did not otherwise fix any exact time for her leaving; that she said: "If anyone calls for me, tell them they will find me at the Valley Hotel" (a Rock Springs' hotel), and that she was going away by auto with others; that she left his home the 5th or 6th of August, but that he was not sure of the exact date after the lapse of four years; that he saw her last about 8:30 in the morning, when he left her at the home with the baby and his eleven year old daughter Bertha; that his boy had been there that night as usual, but he could not say whether he was at the house when he, Morris, left the home to go to town; that he asked Mrs. Rowland if she wanted him to make arrangements for moving her luggage and she said: "No, that is taken care of. I will take that with me when I go"; that she had a suitcase or two and a small metal trunk that Morris had discarded and given her; that she had nothing except apparel for herself and daughter and her own blankets which she had brought with her to use as bedding; that he stayed down town until twelve o'clock noon, when he

returned home and found that Mrs. Rowland and her child had gone; that on his return he passed a neighbor's home and saw his daughter there, who told him she had the baby with her. On cross-examination Morris was asked: "Did your daughter or your son tell you that she (Mrs. Rowland) had left there?" and he answered: "My daughter told me that she had gone when I first saw my daughter."

Mrs. Rowland evidently told several of the neighbors of her intended departure. One witness for the State said she told him she didn't like Rock Springs and that she liked it better in Denver and was going there. Another witness stated he saw Mrs. Rowland on August 3, 1924 at his house; that she said she was leaving Rock Springs; that some party was coming for her, and she was going with him if he came. Still another State's witness said that she talked with Mrs. Rowland July 27, 1924; that she said there was a man coming through by the name of Cummings and she was going through with him, leaving with him; that if he didn't come she was going to Denver when her month was up; on cross-examination the same witness testified that Mrs. Rowland told her that there was a man coming through with other people for her and after taking a little trip they were going to Denver, provided she didn't make up her mind to go to another place in Wyoming where another fellow had offered marriage. This witness was absent from Rock Springs until August 4, 1924. After she returned, her testimony is, she asked Morris' eleven year old daughter if Mrs. Rowland was still there, and the daughter told her she was gone. This witness also several times asked Morris if he had heard from Mrs. Rowland and he stated that she was gone, but he had heard some rumors that she was up town working in a beauty parlor and staying at the Valley House. All of these conversations with Mrs. Rowland were related by people who were neighbors of Morris.

The married daughter of appellant who lived nearby with her husband, as a witness for her father, told of frequently visiting the Morris home when Mrs. Rowland was there and on a date she could not fix, sometime in the evening, she went into the house and found Mrs. Rowland packing her clothes; that in response to witness' inquiry, Mrs. Rowland said she was leaving; that her sweetheart was coming, and that she then remarked: "I don't want to see him here." Morris was not present on this occasion. The daughter's husband testified to a somewhat similar statement made to him by Mrs. Rowland that evening.

There was testimony by Mrs. Griffiths that George Cummings, who lived in the Griffiths' home in Denver, left there about August 6, 1926, in his car for Rock Springs, to get her sister, Mrs. Grabe; that he returned to Denver on the night of the 7th of August, 1924, between ten and twelve o'clock and reported that Mrs. Grabe was not at Rock Springs; that on August 9, 1924, Mrs. Griffiths caused a telegram to be sent to Anna Rowland, addressed to 614 Eleventh Street, Rock Springs, and received a service wire from the Postal Telegraph Company stating that the telegram had not been delivered for the reason that "addressee left for Denver this morning."

A nephew of Mrs. Rowland, a travelling salesman, passing through Rock Springs on August 14, 1924, went to the house at 614 Eleventh Street but found no one at home. There appear to have been no further efforts made at that time to find the missing woman and her child, so far as this record shows.

A witness by the name of Santich, who lived in a house about 150 to 175 feet from the Morris house, told of an occasion when he came home at night between eleven and twelve o'clock; that he had taken off his clothing and had just laid down on the bed when he heard two shots. What kind of shots he could not tell—"they just blow

hard,''—from the direction of the Morris house, and pretty close to his own house. That upon hearing the noise he got up and heard some dogs barking loudly around the Morris house; that Morris came out of the house a couple of times and moved around as though he was looking for something, then he went down in the cellar for a minute or more; then he came up and went to the shanty in the corner of the lot, went in the house, came out again, went in the cellar again, stayed for half a minute and then a little thin boy jumped from the house and ran up Tenth Street. On cross-examination he stated that he could not tell what night it was, but it was "about the summer time" from eleven to twelve o'clock; that he did not know what the shots were or where they were shot. Replying to a question: "What was the character of night, light or dark?" he answered: "It was moonshine."

Counsel for appellant calls attention to the astronomical fact that at Rock Springs the moon had set before eleven o'clock on the nights of August 4th, 5th and 6th, 1924.

Appellant stated on cross-examination that during the time Mrs. Rowland was living in the house, there were no firearms there but prior to that time there had been a shotgun.

It appears from the record that after August 4, 1924, neither Anna Grabe, nor her child Geneva, was ever again seen by any of her relatives or friends.

After the date last mentioned the appellant continued to live in the house at 614 Eleventh Street. He testified that as soon as Mrs. Rowland advised him she was leaving, he had immediately made arrangements with a Mr. and Mrs. Claude Hall to come into the house; that Hall came at once and sent for his wife who came later. Meanwhile one of the women neighbors, at the request of the daughter Bertha, came over to the house and took care of the baby each morning until the latter part of August, 1924. After that she had nothing to do with the child, as

Mrs. Hall was in the house. The Halls lived in the dwelling with Morris and his children until about the 10th or 11th of November of that year.

Appellant testified that he found it impossible to secure competent help to look after his infant child, that the eleven year old daughter could not take this responsibility and ought to be in school, so on October 25th, 1924, he left Rock Springs with these two children and took them to his mother and father in Missouri; that while he was absent Mr. and Mrs. Hall and the fourteen year old son of Morris continued to live in the house; that he returned to Rock Springs on November 3, 1924; that after the Halls left, Mr. and Mrs. Peterson lived in the house with Morris and his son, during the winter of 1924 and 1925; that Peterson used the cellar that winter for the storage of food stuffs—potatoes and similar articles; that Peterson put a lock at that time on the cellar door because of such storage.

Morris continued to live in the house and work in the mines until considerably over a year after his wife's death, when he married his present wife. They, and his son, resided in the house until about September 1st, 1926, when appellant, having had word he could have work at his old employment, with his son, left early in the morning or at night by auto for Missouri. The wife stayed on in the house for about a month and later came to Missouri. Upon returning to that state, he assumed his true name of Morris—he having previously lived there and been thus known.

From September 24, 1926, to March 23, 1928, a family by the name of Mosteller, lived in the house, having moved in a few days before Mrs. Morris left. In the cellar of the house, along the west wall, Mr. Mosteller found an old discarded cupboard, an old box and a large barrel. He kept his kindling wood there and went down daily after it. He noticed an offensive odor there in the cellar

immediately after moving into the house, and found the carcass of a cat which he caused to be removed. After the cat was taken out, he still noticed a sickening odor. How long this odor persisted or whether any steps were taken to ascertain its cause, the record does not show.

There is testimony—although this is not quite clear—that the house was vacant from March 24, 1928 to April 3rd following, when a man by the name of Yovich moved his family into the building, who at the time of the trial was still residing there. On August 28, 1928, this man, while digging in the cellar of the house to put in a water pipe connection, exhumed two skeletons, one that of an adult, the other that of a child. These remains were found in a shallow grave made in the dirt floor of the cellar, the grave being twelve or fourteen inches deep; there being on the skull of the adult probably four inches of soil. The remains were found in the southwest corner of the cellar, the feet to the south and the heads to the north, the feet being close to the south side, probably not over three inches distant. Sundry articles were found with these skeletons, among them being the following: A piece of newspaper with items all dated August 2nd, 1924, a bracelet, apron and skirt cloth, two garters, two lady's slippers, one .22 caliber shell, one shotgun shell, a hammer handle and a lady's cloth belt. There was also lime found scattered all through the grave, calcium hydrate, the substance used for building purposes. Yovich notified the coal company officers and the coroner took possession of the skeletons and articles found.

A dentist practicing his profession in Denver was called as a witness at the trial, who testified that he had done dental work for Mrs. Grabe and produced his record of such work. He stated that he recognized some of the dental work appearing in the teeth of the skull of the adult as of his workmanship and as being work that he did for Mrs. Grabe. Still, in response to the question, on

cross-examination: "Outside of your record, you wouldn't be willing to state to this jury that you did that work?" he answered: "Without my record I would not want to say." The record itself does not indicate the particular teeth upon which the work was done.

However, the sisters of Anna Grabe either positively identified the slippers and several articles of dress as belonging to the latter or stated that they were articles similar to what she had and used.

There was medical testimony that the adult skull was that of a woman about the age of Anna Rowland and that the other remains were those of a child three or four years old; that the adult skull showed holes through the two temporal bones, one on each side, and a little fracture of the upper jaw; that the fracture of the jaw was caused before death, this opinion being given because of the diffusion of blood into the tissues around the fracture; that the holes in the head were caused by a gun shot, and that the skull of the child showed several fractures, either of which were sufficient to cause death.

Appellant, being charged with the murder of Anna Grabe, was arrested in Missouri and extradited to Wyoming for trial. As a witness in his own defense, he denied that he killed either Anna Grabe or her child, stating, as already indicated, that he last saw her when he left the house about 8:30 that morning and that she was gone when he returned at noon.

Among the instructions given to the jury by the trial court, was the following, as No. 3:

"It is incumbent on the prosecution to establish all the material allegations of the information filed in this case beyond a reasonable doubt. The material allegations of the information as herein used are as follows:
1st. That Anna Grabe was killed and murdered by some criminal agency;

2nd. That she was killed and murdered within this County of Sweetwater, and State of Wyoming, and at or about the time stated in the information; and

3rd. That the defendant, Henry B. Morris, had a criminal agency in that killing.

"If these allegations are established in your minds beyond a reasonable doubt, then the prosecution has established beyond a reasonable doubt all the material allegations of the information.

"It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the state should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of the evidence or may not be established. It is not meant that it is incumbent on the prosecution to establish every fact surrounding such testimony as has been given, beyond a reasonable doubt. All that is incumbent on the prosecution is that all the facts and circumstances taken together should establish the defendant's guilt beyond a reasonable doubt from all the evidence in the case."

For the appellant it is argued concerning this charge that the words "If these allegations are established in your minds beyond a reasonable doubt, then the prosecution has established beyond a reasonable doubt all the material allegations of the information," were seriously misleading and the jury could easily have inferred that in reaching a verdict of guilty of murder in the first degree it was unnecessary to find that the killing was done "purposely and with premeditated malice," as the statute requires. The information specifically alleged that appellant "on the 4th day of August A. D. 1924, in the County of Sweetwater in the State of Wyoming, did unlawfully, willfully, feloniously, purposely and with premeditated malice, kill and murder one Anna Grabe, a human being." With this contention of appellant, after thorough and careful examination of the entire charge to the jury in this case, we are inclined to agree. It is certainly elemen-

tary, as stated in Meldrum v. State, 23 Wyo. 12, 146 Pac. 596, 603:

"The jury must find from the evidence beyond a reasonable doubt that all of the elements constituting the crime charged were present at the time of its commission before they are authorized to return a verdict of guilt, and anything less does not satisfy the law."

Again, this court had previously dealt with the same subject in State v. Pressler, 16 Wyo. 214, 92 Pac. 806, 809, 15 Ann. Cas. 93, a case involving a charge of first degree murder and clearly covered a phase of the point now raised by use of the following language:

"But in criminal cases, in order to convict, the prosecution is required to prove every material allegation of the indictment or information—every essential element of the crime charged—not only by a preponderance of the evidence, but to the satisfaction of the jury beyond a reasonable doubt. And if upon consideration of all of the evidence in the case there exists in the mind of the jury a reasonable doubt as to the existence of any one or more of these essential elements which must be proven to render the act criminal, the defendant is entitled to the benefit of that doubt and should be acquitted. For instance, where the charge is murder in the first degree and the killing is admitted or clearly proven, the burden still rests upon the prosecution to prove that such killing was done purposely and with premeditated malice, and a failure to establish either beyond reasonable doubt will entitle the defendant to an acquittal of that degree of crime."

It needs no argument that this is a correct statement of the law governing the crime of murder in the first degree, as it is at present defined by our state statute.

It is likewise true that under the operation of statutes separating murder into first and second degree after the manner of the Wyoming law, it is generally held that while the presumption from the proof of a killing or

a killing with a deadly weapon in the absence of other evidence as to the circumstances of the killing may be that it was murder, the particular grade of the offense thus determined will be murder in the second degree only. As said by the Supreme Court of Iowa in State v. Leib, 198 Ia. 1315, 201 N. W. 29, 31:

"Under our statute, murder is murder in the first degree if it has the additional element of premeditation and deliberation. Proof of intentional homicide, without the circumstances of mitigation or excuse, affords a presumption of malice, and therefore murder. The use of a deadly and dangerous weapon in a deadly and dangerous manner raises a presumption of malice, and therefore of murder; but in such instances, the presumption is of murder in the second, and not in the first, degree. State v. Phillips, 118 Iowa 660, 92 N. W. 876. The intent to kill may be inferred from the use of a deadly weapon in a deadly and dangerous manner; but it is not sufficient from this alone to draw the inference of deliberation and premeditation, for this would make one inference the basis of another, which, of course, cannot be done. State v. Phillips, supra."

See also Parker v. State, post. 30 C. J. 146-7, Sec. 358 and cases cited.

With these views counsel for the State do not appear to find fault. They say first that no exception or objection was taken to the giving of this instruction by the court below, and that no complaint concerning it is made in the specifications of error filed by appellant. But the familiar rule heretofore announced by this court in Parker v. State, 24 Wyo. 491, 161 Pac. 552; Cirej v. State, 24 Wyo. 507, 161 Pac. 556; and Ohama v. State, 24 Wyo. 513, 161 Pac. 558, touching the failure to save exceptions to prejudicial rulings and instructions in capital cases should, we think, govern here. Under that rule, which we believe to be a wholly salutary one, it is our duty to

consider and determine the effect of instruction No. 3, attacked by appellant in his brief, as before indicated.

It is next insisted that the criticized instruction follows instruction No. 12 in the case of Horn v. State, 12 Wyo. 80, 73 Pac. 705, 723, and there discussed by this court, and it is said that in order to reach the conclusion that instruction No. 3 is erroneous in the case at bar, we must overrule the earlier decision. In this we think counsel are mistaken, and some of our reasons for adopting this view are these.

First, the point now raised against the instruction was neither discussed nor decided in the Horn case. A perusal of the opinion written therein shows clearly that only a portion of the instruction was under consideration by this court, to-wit that part reading:

"It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the State should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimony, as given, beyond a reasonable doubt."

A careful examination of the original briefs on file in that case in this court makes it perfectly clear, too, that the point we now have before us was not even suggested for the consideration of the court, and that the only criticism urged was as stated and considered in the opinion.

Again, the facts of that case were radically different from those appearing here. The Horn case was not at all one where the evidence, to connect the defendant with the crime, was wholly circumstantial, as the situation now being examined, but involved an alleged confession on the part of Horn concerning the crime charged. If the jury believed that confession to have been seriously made and that it was not mere bragging or a "josh" as contended

by Horn, and that it had been sufficiently corroborated by other evidence, then a finding necessarily followed that he was guilty of murder in the first degree. Possessed of such a belief, the jury could not properly have found him guilty of any other crime, for the element of premeditation was fully covered by the confession relied upon by the State. Hence, it is obvious that such an instruction could not be regarded as prejudicial to Horn. Touching the proof of premeditation in the record at bar, we shall have somewhat to say in a subsequent portion of this opinion.

Further, an examination of the record in the Horn case, discloses that before giving the attacked instruction No. 12 referred to above, the trial court gave a positive and emphatic charge in the second instruction that:

"To find the defendant, Tom Horn, guilty of murder in the first degree, you must find from the evidence, beyond a reasonable doubt, that he killed the deceased purposely and with premeditated malice."

The substance of this particular charge was also reiterated by the court in its instruction No. 3 in that case.

Nothing so clear and positive on this vital phase of the matter appears in the instructions now under consideration. Instead, after defining the several degrees of murder and also the crime of manslaughter, and after elucidating the meaning of the phrase "purposely and with premeditated malice," the jury were told in instruction No. 9 that "so long as you or any one of you have a reasonable doubt as to the existence of any one of the elements necessary to constitute the crime of murder, the accused can not be convicted of such crime." The jury were also advised, by instruction No. 6, and, of course, correctly, that "the distinction of murder in the first degree and murder in the second degree is that in murder in the second degree there is no element of premeditation."

But the jury, having already been informed by instruction No. 3 that *all* the material allegations of the information were proved when the State had established beyond a reasonable doubt that Anna Grabe was killed in Sweetwater County, Wyoming, by the criminal agency of appellant at or about the time charged in the information, the whole matter touching the vital element of premeditation was left in such a confused condition that it is difficult to see how a jury of laymen could reconcile the conflicting portions of the charge and attain a correct conclusion as to what was the law which should govern them. If ever there should be a correct statement of the law for the guidance of a jury, it certainly should be in a capital case. In our judgment, under the circumstances disclosed by this record, instruction No. 3 was erroneous and prejudicial to the rights of appellant. We say this not only in view of the confusing character of the charge hereinabove discussed, but also having in mind what is subsequently said herein concerning the state of the record, relative to the element of premeditation. See James v. State, 27 Wyo. 378, 196 Pac. 1045; Bird v. State, 36 Wyo. 532, 257 Pac. 2, 17 C. J. 342; Dickens v. People, 67 Colo. 409, 186 Pac. 277.

Before concluding our discussion relating to the instructions given the jury, it may be well to mention that the language used in instruction No. 14, where it is said: ''to warrant a conviction it (the evidence) must be such as to produce in the minds of the jury, that certainty of guilt that a discreet man would be willing to act upon in his own grave and important concern,'' is hardly to be regarded as well chosen. While a radical dispute exists among the authorities as to the propriety of such a charge, still in Palmerston v. Territory, 3 Wyo. 333, 23 Pac. 73, language of similar purport was criticized in an instruction there being considered. The case was reversed and it was remarked in part:

"Now, it is plain that not only ordinarily prudent men, but men of the highest prudence and sagacity, often do and must choose between two lines of conduct, and act in matters of the greatest importance, upon a very slight preponderance of evidence."

See also Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627, where substantially this form of instruction was again considered, but under the peculiar circumstances there appearing, was held not to have misled the jury. The note appended to the case of Lovett v. State, 30 Fla. 142, 11 So. 550, 17 L. R. A. 705, 706, where supplemental cases are cited, is likewise instructive on the point. See also. 16 C. J. 995, Sec. 2407, and lists of cases there given. It is unnecessary to decide here that the use of this language in the charge was error.

For the appellant it is also strongly argued that there is no evidence in the case of premeditated malice. To this contention the State replies, in the words of a well known text: "The essential premeditation and deliberation may be inferred from the circumstances of the killing" (30 C. J. 142), and many cases have been cited supporting this view. It is then said on behalf of the State that the evidence establishes that Anna Grabe was killed by a gunshot wound through the head after an assault and battery had been perpetrated upon her sufficient to knock her unconscious. It might be conceded that if such a situation was disclosed, there would, under the authorities submitted, be evidence of premeditation.

However, as we have seen, the evidence in the case is entirely circumstantial. If the fact asserted by the State as proven appears, it must be by logical and fair inference from established circumstances, for that is the basis of this kind of evidence. The proven data upon which the State lays its premise, are found in the testimony of two physicians who examined the skull of the adult skeleton.

One of these witnesses testified in substance regarding the matter: That upon examination of the skull, he found two wounds, one on each side of the head and also a wound in front involving the bone of the upper jaw; that the latter wound was a fracture of the bone, involving the palate, apparently the result of a blow; that in the opinion of the witness, the fracture had the appearance of a wound having been made before death; that witness concluded this was so because of blood stains in the nasal cavity and along the fracture line; that while it was impossible to state definitely what caused the two holes on each side of the head, that they could have been caused by a gunshot wound and they have that appearance; that these holes were made either before death or shortly afterward.

Relative to the same subject the other witness in brief testified: That the adult skull was abnormal in having holes through the two temporal bones, one on each side, and a little fracture over the upper jaw; that the fracture undoubtedly occurred before death, witness basing his statement on account of the diffusion of blood into the tissues around the fracture; that the holes in the skull caused death and were effected by some external violence of high velocity, such as produced by firearms; that there would not be blood stains from a fracture inflicted shortly after death.

Analyzing this testimony, it will be observed that concerning the wound consisting of the two holes in the skull, the first witness was not certain as to their cause, nor whether they were caused before or shortly after death; the second witness asserted they caused death and were produced by the agency of firearms. Regarding the fracture wound, both witnesses conclude it was caused before death, because of hemorrhage appearing about it. The first witness says this wound was the result of a blow. There is nothing in the record indicating or purporting

to show how the blow was inflicted—whether by human agency or by a fall. If the actual facts were that appellant had inflicted by a gunshot the wound appearing on the skull through the temporal bones, and the victim had fallen, heavily striking furniture or other hard objects with the upper jaw, the impact causing a little fracture of that jaw, it would hardly be contended, under the other circumstances disclosed by this record, that there was proof of premeditation under our law. Yet we are unable to see why this assumed hypothesis does not coincide with the proven facts before us, quite as completely as the conclusion urged on behalf of the State—i. e. that the blow was first struck by a human agency and then the fatal shot was fired. It is not in the least clear from this record either how soon death ensued after the wounds through the temporal bones of the skull were inflicted.

Just here, we may call attention to the significant language of a standard text on medical jurisprudence, to the following effect:

"It is not always easy to say whether a *fracture* was produced while the body was living or dead. If the body was still warm when a post-mortem fracture was produced there is little difference from an ante-mortem fracture, except that there may be a little less blood effused. In a fracture produced after *rigor mortis* has set in there is little or no blood effused." Witthaus & Becker on Medical Jurisprudence Forensic Medicine and Toxicology (2nd Ed., Vol. II, p. 37.)

In 3 Wharton & Stille's Medical Jurisprudence, we find this language:

"The distinction between wounds inflicted just before or immediately after death is often extremely difficult, if not impossible, especially when death results rapidly by hemorrhage from a large artery or vein. In these cases if a wound is made upon the dead body near to that which occasioned death, and the second wound be made

soon after death, it will be impossible to distinguish the one from the other by any characteristic sign.''

If the statements of these texts are correct, there would seem to be grave doubt whether it could be stated with any degree of accuracy that the fracture in question was caused before or a short time after death. Especially would this appear to be so if the remains, as here, were four years old and were taken from the ground where they had lain with lime and wholly unprotected by a burial receptacle.

But whether the several statements of these texts be so or not, after a painstaking study of the matter, we think that the evidence in this record relative to the wounds on the adult skull, fails to establish facts from which premeditation could logically or fairly be inferred, so far as the appellant is concerned.

We have no fault to find with the legal view that premeditation can be inferred from the circumstances of the homicide, but it must also be true that the inference must be a legitimate one. Where repeated wounds found upon the victim are such as could only be caused by human agency, then it is easy to see why such an inference might properly be drawn. An examination of the cases cited by the State demonstrates, we think, the correctness of this view. For instance, in State v. Gaines, 144 Wash. 446, 258 Pac. 508, it was proven in the case that the victim had been choked to an extent which could have produced death and that she had been beaten on the head with a rock. Again, in Weldon v. State, 168 Ark. 534, 270 S. W. 968, 971, it appeared that the victim's body ''was perforated three times through the center with bullets from a pistol or rifle, and was also horribly mutilated with a knife.'' It is evident that the wounds referred to in those cases were caused by a force exerted by some person and the inference of premeditation could, therefore, be prop-

erly made. It is unnecessary to review the authorities further.

The evidence in this record has heretofore been outlined with some considerable particularity. An examination of it certainly establishes that the case is a strange and a most unusual one. There is no proof of any preparation by appellant to commit the alleged crime; no proof of a motive on his part which could lead to such revolting conduct; no ill will, jealousy or illicit relations are shown to have existed between Anna Grabe and appellant; no possession by him of property of the victim or any other fruits of the alleged crime appears; no threats against her by appellant and no sort of quarrel or disagreement between these parties are disclosed; there is no concealment or flight on the part of appellant shortly after the commission of the crime charged; there appear to be no confessions or admissions proven to have been made by him to connect him with the crime. No blood stains appear to have been seen in the house, though neighbors were in the dwelling shortly after August 4, 1924. The cellar of the house opens upon a yard, apparently available for others to use for short cuts across the camp. There is no evidence that Morris made any effort to prevent others from entering the cellar and its door seems to have been left unlocked except during the winter of 1924-25, and then the lock was put on by another family living in the house. The appellant continues to live in the house for more than two years after the crime is alleged to have been committed; the neighbors come to his home to take care of his children immediately after Anna Grabe ceases her duties as housekeeper; he invites other families to live in the house with him and his children, and they take up their abode there within a month of that time and continue to reside there, having access to the cellar of the house in which they keep provisions, etc.; he goes away to Missouri about three months after the date of the crime

charged, is absent from Rock Springs for some nine days, leaving another family and his boy living there in complete control of the premises; and subsequently, about a year and a half after his first wife's death, he remarries and brings his second wife to live in this very house where they remain for more than a year and then he moves to Missouri, leaving the premises with whatever they may disclose to be occupied and used by others. His past record, so far as temper, troubles with his family, the neighbors or local authorities are concerned, seems to be free from criticism.

On the other hand, these remains were found in the cellar of the house where appellant lived and where Anna Grabe had, for about a month, worked. She and her child have disappeared and there is testimony in the record identifying these remains as those of her and her child. It is a legitimate inference that appellant had the opportunity to commit the crime and to bury the bodies in the cellar of his house.

Yet in this connection it may not be amiss to recall that Mr. Burrill, in his oft quoted work on circumstantial evidence, Sec. 549, speaking of opportunity to commit crime, remarks that:

"Admitting it proved to have existed, it does not necessarily follow that it was actually taken advantage of by the party shown to have possessed it; or that it was not taken advantage of by another person. In order to give it this effect, where it is solely or chiefly relied on, the circumstances tending to show its existence must be *exclusive* in their operation, by demonstrating that no other person had, or could have had the opportunity possessed by the accused, and that, therefore, by a necessary consequence, none but he could have committed the crime."

And the Supreme Court of Illinois, in the purely circumstantial evidence case of People v. Holtz, 294 Ill. 143, 128 N. E. 341, 344, dealing with the same subject and referring to the two defendants there involved, said:

"Being present they had the opportunity to commit the crime, but opportunity, alone, is not sufficient to justify a conviction even though they are unable to show who did commit it. The burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by them and not by some other person, and this burden is not sustained by proof of opportunity to commit the crime not accompanied by proof that no other person could have had a like opportunity."

These statements of the law are correct, as we understand the principles governing circumstantial evidence.

As has already been intimated, this case has been for us one of much difficulty and unusual mystery. Important matters which so often—indeed usually—appear in connection with a prosecution of this kind by the means of circumstantial evidence, are wholly wanting. If it were established pursuant to law that appellant killed Anna Grabe and her child, there should and could not be the slightest hesitancy in adjudging that the punishment prescribed by the law should fall upon him. He may be guilty. But he is entitled to a fair trial before a jury instructed as to the law of this state, in such manner that there can be no likelihood of their being confused or misled in so grave a situation. The State, too, must establish its case by proof of facts from which due and proper inference of the elements of guilt may be drawn. A new trial may result in the discovery of new evidence, which may supply some of the important matters which are now missing, and may render clear much that in the present record is obscure and doubtful.

Accordingly our conclusion is that the judgment herein should be reversed and the verdict set aside, and the cause remanded for a new trial.

*Reversed and Remanded.*

BLUME, C. J., and KIMBALL, J., concur.