UNITED STATES of America,
Appellee,

v.

John RADFORD a/k/a John Ratkovich,
Appellant.

No. 10101.

United States Court of Appeals
Fourth Circuit.

Argued April 7, 1966.

Decided May 31, 1966.

See also D.C., 240 F.Supp. 76.

778

Arthur W. Kupfer, Baltimore, Md. (Court-assigned counsel), for appellant.

Thomas J. Kenney, U. S. Atty. (Fred Kelly Grant, Asst. U. S. Atty., on brief), for appellee.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and BARKS-DALE, District Judge.

BARKSDALE, District Judge:

Upon his plea of not guilty, John Radford was found guilty by a jury in the District Court for the District of Maryland on April 22, 1965, upon an indictment charging him with bank robbery in violation of 18 U.S.C.A. § 2113. After his motion for a new trial had been overruled, he was sentenced to a term of twenty years' imprisonment, to be eligible for parole at the determination of the Parole Board. From this conviction and sentence, Radford has prosecuted his appeal to this court. Briefly stated, the pertinent facts are as follows:

### THE FACTS

Shortly after it had opened on November 6, 1964, the federally insured Peoples National Bank, at its Adelphi, Maryland, branch, was robbed by a white man wearing a light tan raincoat, a tan or grayish rain hat, dark rimmed glasses, and a white mask. As he entered the bank carrying an automatic pistol in his hand, he announced, "This is a hold up.", and ordered everyone to get down on the floor. Before obeying this order, two of the bank employees pressed alarm buttons connected with the County Police Department, and this signal was received in its Hyattsville office at 9:23 A.M.

There were six people in the bank at the time, two customers and four employees. Threatening to shoot two employees if they did not get down on the floor, the robber went behind the tellers' cages to the cash drawers at their windows and took $2,348.00. After taking the money, he hastily left the bank by the front door, turned to his right, and pulled his mask from his face.

The bank is located in a small shopping center near the University of Maryland. The shopping center consisted of one building divided into five different business locations, with a sidewalk running the full length of the front of the building. As the robber left the bank, a salesgirl of John's Bargain Store, next door to the bank, was returning to the store with coffee. As the robber came out of the bank, she was quite close to him, and looked him full in the face after he had taken off his mask and glasses. She had an even better look at him when he stopped a little more than five yards from her, turned and faced her when he stopped to pick up his hat which had fallen off. Another lady who had parked to go into the Laundromat saw him stop to pick up his hat, observed his light colored raincoat and rain hat, and saw him jump into a light colored compact. Of course, all four of the bank's employees saw and observed him closely while he was in the bank. Two of them ran from the bank immediately after the robber left and saw him get into a tan Corvair. One of these employees, George, ran after it, getting within thirty feet of the car and parallel to it, and had a good look at the then unmasked driver. George noted the license number, and although, when he wrote it down, he made an error as to one letter, he noted that it was a Maryland license tag and the testimony and records from the Commissioner of Motor

Vehicles for Maryland showed, beyond doubt that this license tag had been issued to the defendant, John Radford, 9006 Manchester Road, Silver Springs, Maryland, for a 1964 Corvair.

Police and F.B.I. agents arrived at the bank within minutes after the robber had fled. During the day, a picture of the defendant Radford was shown to several witnesses. Two of these witnesses, who had the best look at the defendant, positively identified the photograph as being the defendant, John Radford. Upon the information they had, F. B. I. agents procured an arrest warrant for the defendant, charging him with the robbery, and placed him under arrest between 4:00 and 5:00 o'clock, when he came to the office of his employer, Beltone Hearing Aid Company in Washington. Defendant was a college graduate and had attended law school, but had not graduated. He was fully advised of his Constitutional rights, and spoke by telephone with an attorney before he was turned over to the Washington police to await appearance before a United States Commissioner the next morning, the Commissioner not being available that evening. Defendant denied having anything to do with the Adelphi Bank robbery. However he told the agents that his car was parked across the street in a parking garage, and that he owned two guns, one of which was in his car. A search of defendant revealed his parking ticket, which the agents took. F. B. I. agents were promptly detailed to keep his car under surveillance.

That night, the defendant was viewed in a lineup by five witnesses who had seen him in or running from the bank that morning, and four of them positively identified him as the robber. The fifth witness picked the defendant out of the lineup, and although declining to positively identify him, said that he was "identically similar" to the robber. During the trial, four of these witnesses positively identified the defendant as the bank robber, even though he chose to sit outside the rail and not at the trial table.

At the trial, defendant denied all connection with the robbery, and undertook to establish an alibi. The evidence relied on by defendant to establish an alibi was by no means convincing, and upon the evidence of the witnesses who positively identified him as the robber, as well as evidence that, although in financial difficulty shortly before the robbery, defendant on the day of the robbery paid two months' rent plus an airconditioning charge, a total of $260.00, deposited $90.00 in a bank, made an overdue payment on his car, and had $386.00 on his person when arrested, and the evidence that the car used by the robber bore tags issued to him, the jury found the defendant guilty as charged. From this judgment of conviction, the defendant has prosecuted this appeal.

## DISCUSSION

Upon his appeal, the appellant, by counsel, raises three questions as follows:

"1. Was the setting of bail at an unreasonable figure of $15,000 a denial of Defendants Constitutional right?

"2. Was it error to allow the evidence taken from Defendants automobile into evidence at the trial of this case?

"3. Was the evidence presented by the United States sufficient to prove guilt beyond a reasonable doubt?"

Taking up these questions in the same order, it appears that initially the United States Commissioner set bail for the defendant in the amount of $15,000.00. Shortly thereafter, on November 17, 1964, defendant filed his petition in the District Court for a reduction of bail. After a hearing on this petition, at which testimony was taken, the District Judge, on November 27, 1964, denied the petition. Thereafter, a similar petition was presented to Honorable Simon E. Sobeloff, one of the Judges of the United States Court of Appeals for the Fourth Circuit, and Judge Sobeloff also denied the petition

Upon the subject of bail, the applicable provisions of the Federal Rules of Criminal Procedure are as follows:

> *"Before Conviction.* A person arrested for an offense not punishable by death shall be admitted to bail. A person arrested for an offense punishable by death may be admitted to bail by any court or judge authorized by law to do so in the exercise of discretion, giving due weight to the evidence and to the nature and circumstances of the offense." Rule 46(a) 1.

> *"Amount.* If the defendant is admitted to bail, the amount thereof shall be such as in the judgment of the commissioner or court or judge or justice will insure the presence of the defendant, having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant." Rule 46(c).

■ It is, of course, well settled that the fixing of the amount of bail is "peculiarly a matter of discretion with the trial court." Kaufman v. United States (9 Cir.), 325 F.2d 305. A refusal to reduce the amount of bail once set should be set aside by an appellate court only when the trial court has abused its discretion. United States v. Foster (4th Cir.) 296 F.2d 249, 251; Stack v. Boyle, 342 U.S. 1, 13, 72 S.Ct. 1, 96 L.Ed. 3.

■ In considering the question of whether he should reduce bail, the District Judge knew that the defendant was charged with bank robbery by intimidation and by putting the employees of the bank in jeopardy by the use of a dangerous weapon, one of the most serious of federal offenses; he knew that the weight of the evidence against defendant was strong; and he was also advised that the defendant was under strong suspicion of robbing two other nearby banks. In fact, before his trial, defendant was indicted for committing the two other bank robberies. Under these circumstances, we are satisfied that the District Judge acted properly in refusing to reduce defendant's bail: certainly, he acted well within his discretion.

■ Counsel contends that the District Judge should have reduced defendant's bail by reason of his inability to post bail in the required amount. It is true that one of the considerations which, in fixing the amount of bail the judge should consider, is "the financial ability of the defendant to give bail", but that is only one of several considerations, and certainly should not control and require that the other considerations be ignored.

Defendant contends that the setting of an amount of bail in excess of his means was, in effect, the denial of his Constitutional rights to bail and deprived him of an opportunity to prepare his defense. For this proposition, counsel cites no authority. It is quite true that the Eighth Amendment of the Constitution provides that:

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.",

and it has been said, in a very old case, that, in a case *clearly bailable by law,* to require larger bail than the prisoner could give, would be to require excessive bail. But the court went on to say:

> "The discretion of the magistrate, in taking bail, is to be guided by the compound consideration of the ability of the prisoner to give bail and the atrocity of the offence." United States v. Brawner (D.C., W.D.Tenn.), 7 F. 86, 89.

■ In the quite recent (April 28, 1964) case of White v. United States (8th Cir.), 330 F.2d 811, certiorari denied 379 U.S. 855, 85 S.Ct. 105, 13 L.Ed.2d 58, almost the identical contentions raised by the defendant here were heard and disposed of adversely to the defendant. The court said (330 F.2d p. 814):

> "We come now to defendant's contention it was manifest error for the District Judge to set defendant's bail at $5,000.00 and deny a pretrial motion for defendant's release on his own recognizance, tantamount to overruling

defendant's claim the amount of bail was excessive. There is no question defendant was entitled to apply for bail prior to conviction. See Rule 46 (a) (1), Fed.R.Crim.P. Subsection (c) of Rule 46 prescribes that the judge fix bail in amount adjudged sufficient to 'insure the presence of the defendant, having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant.'

"Defendant urges his impecunious financial status and loss of pretrial freedom essential to the preparation of his defense are the overriding criteria of 'excessiveness' which Amendment VIII forbids. Citing Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951). No extended discussion of the formula outlined in Rule 46, supra, is necessary as justification for our agreement with the propriety of its application by the District Judge under the circumstances of this particular case. We simply point out that the governing criterion adopted by this Circuit to test the excessiveness of bail proscribed by Amendment VIII is, not as defendant suggests, but whether bail is 'set at a figure higher than an amount reasonably calculated to insure that the accused will stand trial and submit to sentence if convicted'. Forest v. United States, 203 F.2d 83, 84 (8th Cir. 1953). The mere financial inability of the defendant to post an amount otherwise meeting the aforesaid standard does not automatically indicate excessiveness. The purpose for bail cannot in all instances be served by only accommodating the defendant's pocketbook and his desire to be free pending possible conviction.

"Furthermore, defendant's requested review of an order fixing bail is improvidently raised upon appeal from a judgment of conviction. Hewitt v. United States, 110 F.2d 1, 6 (8th Cir. 1940), cert. denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409 (1939);

Kaufman v. United States, 325 F.2d 305 (9th Cir. 1963). As stated in Stack v. Boyle, supra, 342 U.S. at page 6, 72 S.Ct. at page 4, 96 L.Ed. 3:

'The proper procedure for challenging bail as unlawfully fixed is by motion for reduction of bail and appeal to the Court of Appeals from an order denying such motion.' "

We are completely in accord with the views expressed above.

■ Was it error to allow the evidence taken from defendant's automobile into evidence at the trial of this case? We think not.

When defendant arrived at the office of his employer, Beltone Hearing Aid Company in Washington, about 4:00 P.M. in the afternoon of the bank robbery, November 6, 1964, F. B. I. agents, armed with a warrant for his arrest, arrested him. Defendant had parked his car in a parking garage nearby, and when searched, his car keys and the parking ticket were found. Defendant told the arresting officers that he owned two guns, one of which was in his car. F. B. I. agents promptly arranged for a surveillance of the car, the purpose of which was to see that the car was not moved nor tampered with until a search warrant could be procured. Of course, this was entirely legitimate. But although it was not known to anyone else until it came out during the hearing on defendant's motion to suppress evidence held on March 26, 1965, during the night of November 6, 1964, two F. B. I. agents, overcome by curiosity, without legal authority, opened the door of the car, took out and inspected one of the bags, or brief cases, in the car. These agents testified that they found only eyeglass frames and papers in the bag, and repenting their action replaced this bag without opening the other one which contained the gun. The next morning, November 7, 1964, F. B. I. Agent Dowling, without any information from these two agents, without even knowing that they had improperly entered the car, upon his affidavit setting out the ample information he had, procured a search warrant and the car was

searched, examined and photographed. In one bag there was found an automatic pistol and a clip containing six cartridges. After taking possession of the automatic, clip and cartridges, the car itself and other contents were delivered to defendant's wife that same day.

Defendant's counsel does not contend, nor indeed could he contend, that the information contained in Agent Dowling's affidavit was not amply sufficient to justify the issuance of the search warrant, but counsel does contend that the search warrant was invalid because it was, as he contends, based on evidence illegally obtained by the F. B. I. agents during their illegal entry of the car during the night of the arrest. Counsel relies on the "fruit of the poisonous tree" doctrine. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

However, the facts do not provide a proper basis for the application of the "fruit of the poisonous tree" doctrine. It is quite true that in Dowling's affidavit reference was made to defendant's gun and the search warrant was requested in order to authorize the search for and seizure of the proceeds and instrumentalities of the crime. But defendant himself, at the time of his arrest, stated that one of his guns was in the car, and in preparing his affidavit, Agent Dowling knew that. The two agents who improperly entered defendant's car during the night of his arrest testified that they did not see defendant's gun, and that they did not open the bag which contained it. After conducting a full hearing on defendant's motion to suppress the evidence obtained under the authority of the search warrant, the District Judge found that the two agents who improperly entered defendant's car, had not communicated that fact to Agent Dowling or anyone else, and that even if it be assumed that they did see defendant's gun in his car, it would make no difference, because they had not communicated any information which they had obtained to Agent Dowling or anyone else. The District Judge found

that the information that defendant's gun was in the car came from an independent source, that is, from the statement made by defendant himself at the time of his arrest.

Assuming that the two agents who improperly entered defendant's car did see the gun, and assuming also that the information about the gun was not obtained from them, but from an independent source, as was found as a fact upon ample evidence by the District Judge, "the fruit of the poisonous tree" doctrine would have no application here. As was said in *Silverthorne* (251 U.S. p. 392, 40 S.Ct. p. 183):

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge obtained by the Government's own wrong cannot be used by it in the way proposed."

And again, in the *Nardone* case, the court said (308 U.S. p. 341, 60 S.Ct. p. 268):

"The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wiretapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

In his opinion and order denying motion of defendant to suppress, the District Judge aptly quoted from United States v. Paroutian, (2d Cir.), 299 F.2d 486, 489:

"An unlawful search taints all evidence obtained at the search or through leads uncovered by the search. This

rule, however, extends only to facts which were actually discovered by a process initiated by the unlawful act. If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible. Silverthorne Lumber Co. v. United States, supra, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Sheba Bracelets, Inc., 2 Cir., 248 F.2d 134, certiorari denied 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259."

We are satisfied that defendant's motion to suppress evidence was properly overruled.

■ As to the question raised by defendant's counsel,

"Was the evidence presented by the United States sufficient to prove guilt beyond a reasonable doubt?",

we feel no hesitancy in answering this question in the affirmative. Undoubtedly, the federally insured branch of the Peoples National Bank at Adelphi was robbed, as charged in the indictment. Neither the defendant, nor anyone else, denied that the robbery took place. Defendant's contention was that he did not commit, and could not have committed, the robbery because he was somewhere else when it took place. At the trial, the Government produced five eyewitnesses who identified the defendant as the robber, even though he chose to sit, not with his counsel, but outside the bar of the court, in the attempt to make identification more difficult. Four of these witnesses positively identified defendant as the man who robbed the bank. Two of them had seen the robber at close range, without a mask, immediately after he came out of the bank. The fifth witness picked the defendant out in the court room and said that, if he was not the same man, he was "identically similar". Four of these witnesses had positively identified the defendant as the robber in a police lineup the evening of the robbery. The defendant admitted that he had used his tan Corvair automobile the morning of the robbery. Immediately after the robbery, the defendant was

seen to drive off in a tan Corvair bearing a number showing that the license tag had been issued to the defendant.

The evidence adduced by defendant in his effort to prove an alibi was not at all convincing. The bank robbery occurred at 9:23 in the morning, and within a very few minutes the robber drove off in his car at a rapid rate of speed. From the evidence, it definitely appears that he left the Adelphi Shopping Center not later than 9:30 A. M. Radford attempted to prove that he was in Arlington, Virginia, at the time of the robbery. However, the earliest time he could verify his presence in Arlington that morning was "between ten-thirty and eleven o'clock". The uncontradicted evidence showed that the time required to drive from the shopping center to Arlington, *obeying all speed laws*, was not in excess of forty five minutes, so there was ample time for the robber to reach the home of the verifying witness well before 10:30 A.M., even if he obeyed the speed laws, which it is quite unlikely that he did.

■ Although no such contention has ever been made by defendant's counsel during or after his trial in the District Court, nor in his brief filed in this Court, nor by defendant himself in his motion for a new trial setting out eleven grounds for his motion, the defendant in his *pro se* "Supplemental Brief for Appellant", makes a contention never mentioned before, in a paragraph entitled:

"Resumption of Argumentation on Motion to Suppress Evidence Without the Presence of the Appellant is a Denial of his Rights to be Present at Every Stage of the Trial."

It is interesting to note from the record that no later than November 27, 1964, defendant employed Mr. Arthur Kupfer of the Baltimore bar as his counsel. Mr. Kupfer made and argued numerous preliminary motions. When the case came to trial, Mr. Kupfer conducted the defense, being assisted by his associate, Mr. Abraham L. Adler. During the hearing on the matter of sentence, it was brought to the attention of the Court that there were two more indictments

for bank robbery pending against the defendant. In reply to questions of the Court, defendant stated that he had no more funds for the employment of counsel and stated that he would like to have Mr. Kupfer appointed to handle his appeal. Consequently, by order of this Court entered on July 26, 1965, Mr. Kupfer was assigned to prosecute this appeal.

However, prior to the argument of this appeal on April 7, 1966, defendant became dissatisfied with Mr. Kupfer's efforts on his behalf, and his letter of March 14, 1966, forwarded to the Chief Judge of this Court, his *pro se* "Supplemental Brief for Appellant" referred to above.

In making this new contention, defendant asserts that, upon his motion to suppress evidence, filed on March 12, 1965, there was a hearing to argue the motion, and it was argued on March 26, 1965, and a continuance was granted to have counsel prepare an argument for illegal seizure of his automobile and that a resumption of the suppression motion was held on March 30, 1965, at which he was not present.

The record does not support this contention. Actually, evidence was taken upon the motion to suppress on March 26, 1965, the defendant being present and testifying in support of his motion. Argument on the motion was heard by the court on March 30, 1965, and there is nothing in the record to indicate that defendant was not present at that time, nor does his counsel so contend. At the conclusion of the argument, defendant's counsel was "given a chance to present something to you (the court) in the way of law", on his contention that the initial seizure of defendant's car was illegal and a violation of his Constitutional rights. It would seem that defendant's counsel failed to find any additional authorities, because there is nothing in the record to show that there was any subsequent hearing on the motion to suppress. Consequently, there was no "Resumption of Argumentation on Motion to Suppress Evidence Without the Presence of the Appellant * * *," so there is no basis for this contention of the defendant.

Although nothing was taken from his automobile while it was under surveillance by F.B.I. agents after he was arrested, nor was any information obtained from it used in his trial nor in the procurement of the search warrant, defendant, in his *pro se* Supplemental Brief renews his contention that his automobile was then "seized" while in the parking garage without warrant of law, which violated his Constitutional rights and rendered all evidence taken from his automobile under the authority of the search warrant obtained the next morning, inadmissible against him. This is not a new contention. It was made by defendant's counsel at the hearing on the motion to suppress evidence and fully argued. Counsel cited no authorities to support this contention, nor do we find any. The District Judge properly overruled this contention, saying:

"* * * under all the circumstances shown by the evidence, including the information indicating that the car had been used for the get-away after the robbery and defendant's own statement to the agents that there was a gun in the car, the agents would have been justified in seizing the car, whether it was in motion or parked, in order to prevent the removal of any instruments or fruits of the crime which might be found therein, or to photograph the car, or both. Preston v. United States, 376 U.S. 364 [84 S.Ct. 881, 11 L.Ed.2d 777] (1964); United States v. Sutton, 4 Cir., 321 F.2d 221 (1963); United States v. Walker, 4 Cir., 307 F.2d 250 (1962). If the car had been left by defendant on a public highway, the agents would have been justified in removing it to a safe place for surveillance and possible seizure until they could obtain a warrant authorizing the search of the car and the seizure of any evidence of the crime found therein, as well as instruments and fruits of the crime. Seizure of the car for the purpose of guarding it until a search warrant could be obtained would not amount to a search of the car and the seizure of any items found therein."

We are entirely in accord with this statement. The authorities cited by defendant, Weed v. United States, 10 Cir., 340 F.2d 827, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, and Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449, deal with entirely different situations and do not support this contention of defendant.

Since we find no error, it follows that the judgment of the District Court will be

Affirmed.