Merle Charles VIGIL, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 4659.

Supreme Court of Wyoming.

April 26, 1977.

■

Robert A. Magee, Public Defender for Laramie County, Cheyenne, signed the brief and appeared in oral argument on behalf of the appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., and John P. Faure, Legal Intern, Cheyenne, signed the brief and appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Appellant-defendant was found guilty by jury verdicts of five counts of assault with a deadly weapon and sentenced by the trial judge on only one count to a penitentiary term. The issues as raised by the defendant are: 1. Whether bond was excessive and, if so, denied defendant a fair trial; 2. Whether permitting the jury to return verdicts on all five counts constitutes double jeopardy and, additionally, denied a fair trial to defendant; 3. Whether Instruction No. 9, on intent, was proper. We will affirm.

Immediately following arrest in early March, 1975, defendant's appearance bond was initially set at $25,000.00. Ten days later, it was reduced to $15,000.00 with 10 percent cash to be deposited as collateral and defendant was released when posted. A few days later, defendant was arrested on another charge alleged to have accrued following release; bond on that charge was fixed at $10,000.00 with a 10 percent deposit. Because of the additional charge, on motion of the State, defendant's bond on the instant charge was modified to withdraw the 10 percent provision, resulting in bond being fixed at a full $15,000.00 cash, which defendant was unable to arrange, resulting in incarceration.

In May, 1975, defendant's bond was modified to permit release by deposit of 15 percent of $15,000.00, which he could not make. A few days later, it was again modified to permit deposit of 10 percent of the principal amount. In June, 1975, it was further altered to $10,000.00, 10 percent deposit. There was another reduction to $7,500.00, 10 percent deposit. On September 5, 1975, a final reduction to $5,000.00, 10 percent cash, and proviso that defendant not leave the state was ordered. Defendant posted bond and was released. Concurrently, trial was set for October 27, 1975. It is noted from the record defendant requested a continuance of his trial first set for May, 1975, and the court specifically found that the State was ready for trial at that time.

Defendant's claim is that because of his confinement, he was unable to adequately assist in the preparation of his defense. Because of this, he asserts that there could not be a fair trial because in the five months of jail time, he lost track of his witnesses and had less than two months to locate them, before trial.

■ After conviction, bail questions are usually mooted and cannot be raised on appeal.[1] 8B Moore's Federal Practice— Criminal Rules, § 46.02, p. 46–11. The question of bail does not directly touch the merits of the charge against the defendant. Moore, § 46.04, p. 46–17.

[1] Even if the conditions of release imposed upon a defendant are unreasonable and excessive, the court is not deprived of jurisdiction nor does it affect the validity of the defendant's conviction. *United States v. Marx*, 10 Cir. 1973, 485 F.2d 1179, cert. den. 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764; *Tafoya v. United States*, 10 Cir. 1967, 386 F.2d 537, cert. den. 390 U.S. 1034, 88 S.Ct. 1433, 20 L.Ed.2d 294; *Moore v. Aderhold*, 10 Cir. 1939, 108 F.2d 729. Issue whether trial court abused discretion by setting excessive bail bond may not be raised on appeal of the merits following a judgment of conviction. *Stack v. Boyle,* infra; *Hemphill v. United States,* 8 Cir. 1968, 392 F.2d 45, cert. den. 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149; *White v. United States,* 8 Cir. 1964, 330 F.2d 811, cert. den. 379 U.S. 855, 85 S.Ct. 105, 13 L.Ed.2d 58; *Kaufman v. United States,* 9 Cir. 1963, 325 F.2d 305; *Hewitt v. United States,* 8 Cir. 1940, 110 F.2d 1, cert. den. 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409. The federal cases hold that the remedy for excessive bail is by interlocutory appeal under special statutory provisions so allowing.

■ Rule 8(h), W.R.Cr.P., provides the remedy for complaints related to bail and is interlocutory in nature:

"Any accused person aggrieved by the application of this rule may apply for a writ of habeas corpus."

This tracks Federal Rule 46, F.R.Cr.P., and the Bail Reform Act of 1966, 18 U.S.C., § 3141, et seq., incorporated by reference in Rule 46, F.R.Cr.P., 18 U.S.C. Section 3147(b), in particular, grants an interlocutory right of appeal to the court having appellate jurisdiction over the court denying bail as moved by the defendant. Instead of providing interlocutory relief by way of appeal in this jurisdiction, it is furnished by rule through the device of habeas corpus. Habeas corpus is the appropriate remedy in the ordinary situation to test the excessiveness of bail.[2] The proper procedure to challenge bail is to move for reduction and seek habeas corpus upon denial.

■ Ordinarily, also, determination of the amount of bail is committed to the sound discretion of the trial judge, and his decision will not be disturbed except in case of a clear abuse of discretion. He is in the best position to have a hold on the entire situation. *Miller v. State,* Wyo.1977, 560 P.2d 739; *State ex rel. Powell v. Ilsley,* Wyo.1963, 387 P.2d 676, 678.

■ However, in determining the precise issue before us, we cannot summarily apply the rules of mootness and trial judge discretion. We must deal with the defendant's exact point that failure to release him on bail he could meet, until a late date, deprived him of a fair trial. That is not one of the criteria mentioned in Rule 8(c)(2), W.R.Cr.P. The guidelines there set out are as follows:

"In determining which conditions of release will reasonably assure appearance, the judicial officer shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the accused, the accused's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings."

The considerations listed in Rule 8 go only to measures related to the risk of flight involved and are to be applied only to the extent they tie in with the likelihood of defendant's appearance.

■ It has long been settled that the sole function of bail is to exact assurance from the accused that he will stand trial and submit to sentence if found guilty. *Stack v. Boyle,* 1951, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3. The court there said: "Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the Eighth Amendment."[3]

■ The defendant's argument probably has its inception in *Stack* because the court there in a few almost buried words said that: "This traditional right to freedom before conviction permits the unhampered preparation of a defense, * * *." 342 U.S. at 4, 72 S.Ct. at 3, 96 L.Ed. at 6. Those words, however, must be reckoned with and, of course, are subordinate to the primary consideration of guaranteeing presence for trial and sentence, if found guilty. A desire to be free in order to prepare a defense is only one of several criteria to be considered. *United States v. Radford,* 4 Cir. 1966, 361 F.2d 777, cert. den. 385 U.S. 877, 87 S.Ct. 158, 17 L.Ed.2d 105. It is the totality of circumstances that govern.

2. It appears that habeas corpus is a common procedure provided for testing the excessiveness of bail in the absence of provision for direct appeal before conviction. *Creech v. State,* Okl.Cr.1972, 500 P.2d 861; *Abbot v. Columbus,* 1972, 32 Ohio Misc. 152, 61 Ohio Ops. 2d 268, 289 N.E.2d 589; *Rendel v. Mummert,* 1970, 106 Ariz. 233, 474 P.2d 824; *State v. McLeod,* 1957, 131 Mont. 478, 311 P.2d 400; *Ex parte Haney,* 1955, 77 Idaho 166, 289 P.2d 945; *State v. Teeter,* 1948, 65 Nev. 584, 200 P.2d 657.

3. Amendment VIII, United States Constitution, provides:

"Excessive bail shall not be required, * * *."

██ There were here a multitude of bail reduction hearings. Collectively, they indicate that the defendant was an appearance risk. His juvenile·and adult record discloses a continuing conflict with the law of both Wyoming and Colorado, though with a remarkable record of acquittals. He was twice found not guilty of murder, once in Wyoming and subsequently in Colorado. He was acquitted several times or released because of a hung jury from Colorado charges of robbery. He had convictions for minor offenses; his military background was unfavorable in that he was court-martialed, resulting in a bad conduct discharge. In the year previous to the current offenses, he had been convicted of assault at the misdemeanor level and served out his sentence. His record of court appearances, while free on bond, has been free of any bail-jumping. His employment record was practically nil, partly because of his being in and out of jail awaiting trial. While the defendant has family in Cheyenne, their association with him was not close.

The nature and circumstances of the offense charged, matters for consideration under Rule 8(c)(2), W.R.Cr.P., were serious, the defendant being charged with five counts of assault with a dangerous weapon, all felonies with up to 14 years on each as a possibility. The inference is that the more serious the offense, the greater the appearance risk. The weight of the evidence against the accused was not adequately presented to the court, at least for our consideration, only the claims of the prosecutor being made. The trial judge would be better acquainted with the reliance he places upon the representations of the county attorney. The evidence did turn out to be strongly against the defendant but we must look back to the time of fixing bail.

We cannot see where the defendant was prejudiced in the preparation for his trial. During the entire time, while awaiting trial, he had the benefit of counsel, to whom he could have furnished the names of witnesses. He claimed, however, that he only knew them by sight but knew how to find them if he were free to do so. Apparently, he also failed to give any leads to his attorneys and appeared to be less than frank with the court. His claim in that connection, however, was so vague and uncertain that it would be difficult to place much stock in this representations. In *United States v. Pomeroy*, 9 Cir. 1973, 485 F.2d 272, cert. den. 415 U.S. 981, 94 S.Ct. 1571, 39 L.Ed.2d 877, a case where counsel was having difficulty locating witnesses and needing the assistance of defendant, denial of bail was held not improper where defendant's counsel had several weeks to locate them but defendant had not furnished names. In that case, defendant was finally released, without bail, at the close of the government's case to locate them.

In this case, when the defendant did finally make bail, he had almost two months to locate his witnesses and produce them. Defendant's alibi witness at trial was his 17-year old wife whom he had married four days previous. She testified she and defendant were in Denver on the day and at the time of the offenses charged. She testified that they were at her sister's house at a known address in Denver. Her sister, husband and two kids were there. She called her mother in Cheyenne long-distance. In her sister's home she stated she and the defendant watched TV and stayed overnight. She said her sister had moved from Denver to Commerce City, Colorado—only a few miles away—but did not know her present address or 'phone number nor had she apparently tried to find them. She never told anybody except her mother—not even Vigil's attorneys—that she and the defendant were in Denver at the time the crimes were committed. She did not talk to the defendant's attorney until the day of the trial. She testified that she had seen Vigil every day for several weeks before trial. No attempt was made to contact her sister and brother-in-law in Colorado. The witness's mother testified that her daughter, Vigil's wife, had called from Denver and advised that defendant had taken her to Denver on the date of the crimes. The sister and brother-in-law of defendant's wife did not testify, subpoenas for their

appearance do not show up in the record nor were their depositions taken.

■ The burden is on the defendant to make some solid showing that his incarceration significantly impeded his preparation for trial and consultation with counsel. *United States v. Williams*, 1969, 416 F.2d 4, cert. den. *Ferino v. United States*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91, and 397 U.S. 968, 90 S.Ct. 1008, 25 L.Ed.2d 262. The record reflects no prejudice nor is any such showing otherwise made.

We cannot arrive at any other conclusion and holding than that the defendant had adequate access to his girl friend, who became his wife before trial, and counsel was not prejudiced in preparation of his case for trial. The court, under similar circumstances, found to the same effect in *Dearinger v. United States*, 9 Cir. 1967, 378 F.2d 346, cert. den. 389 U.S. 885, 88 S.Ct. 156, 19 L.Ed.2d 183, cert. den. 396 U.S. 1030, 90 S.Ct. 603, 24 L.Ed.2d 525, reh. den. 397 U.S. 1004, 90 S.Ct. 1132, 25 L.Ed.2d 417.

■ As said in *Miller v. State*, supra, it is not necessary for a court to repeatedly reduce bail to a point that it can be made by the defendant; the measure is adequacy to insure appearance.[4] The purpose for bail cannot in all instances be served by only accommodating the defendant's pocketbook and his desire to be free pending possible conviction. We break off the bail question as moot, hold that the trial judge did not at any time abuse his discretion in fixing bond and find further that it was not excessive.

Our holding that bail was not excessive is under the bail provisions of the Constitution of the State of Wyoming and not Amendment VIII of the Constitution of the United States. Section 14, Article I, Wyoming Constitution, provides that:

"All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presump-

tion great. Excessive bail shall not be required, * * * *".

Wyoming jurisprudence affords the same protections as that of the United States. *Raigosa v. State*, Wyo.1977, 562 P.2d 1009; *Dodge v. State*, Wyo.1977, 562 P.2d 303; *Richmond v. State*, Wyo.1976, 554 P.2d 1217, reh. den. 558 P.2d 509.

■ The defendant next complains he was subjected to double jeopardy because the jury was permitted to return verdicts of guilty on all five counts. However, there were not five sentences. The trial judge in his judgment and sentence declared that the "Defendant having heretofore at the present term of this Court, duly been found guilty by a jury to the crime charged in the Information [sic] filed herein, to-wit; one count of assault and battery with a deadly weapon,". The defendant was tried on a grand jury indictment, charging him with five counts of assault and battery with a deadly weapon, one count for each occupant of the vehicle at which defendant fired and struck with several bullets shot from a handgun. The court thus concluded that there was only one offense charged and proven. Upon that verdict, the trial judge imposed only one sentence that the defendant "be imprisoned and confined in the Wyoming State Penitentiary * * * for a period of not less than four (4) years nor more than ten (10) years; * * * *." That is one judgment. There is only one final judgment. The final judgment in a criminal case means sentence. The sentence is the judgment. *Berman v. United States*, 1937, 302 U.S. 211, 212, 58 S.Ct. 164, 165, 82 L.Ed. 204. This is consistent with Rule 33(b), W.R.Cr.P., providing that, "A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence. * * * *" There is no judgment against the defendant until sentence is pronounced.

Section 11, Article I, Wyoming Constitution, provides, " * * * nor shall any person be twice put in jeopardy for the same offense. * * * *"[5] Our holding on the

---

**4.** Bail is not excessive merely because defendant is unable to meet it. *Hodgdon v. United States*, 8 Cir. 1966, 365 F.2d 679, cert. den. 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676; *White v. United States*, supra.

**5.** The Fifth Amendment to the Constitution of the United States provides " * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; * * * *"

double jeopardy issue raised by the defendant shall be under the Constitution of the State of Wyoming and not that of the United States. *Richmond v. State,* supra. While the respective double jeopardy provisions of the Wyoming State Constitution and the Fifth Amendment to the Federal Constitution are dissimilar in language, they have the same meaning and are coextensive in application. Because of the availability of federal cases on the subject, they will for the most part be cited in support of this court's views, where appropriate Wyoming jurisprudence may be lacking.

There is much turmoil in the case law involving double jeopardy and the cases are difficult to reconcile.[6] However that may be, for our purposes by way of introduction to our particular issue, the United States Supreme Court in a recent case did give an excellent history of the double jeopardy clause and did summarize some settled principles, useful to us, worth repeating. In *United States v. Wilson,* 1975, 420 U.S. 332, 342–343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232, 241, the court capsulized:

> " * * * In *North Carolina v. Pearce,* 395 U.S. 711, 23 L.Ed.2d 656, 89 S.Ct. 2072, (1969), we observed that the Double Jeopardy Clause provides three related protections:

>> 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'

Id., at 717, 89 S.Ct. 2072, 23 L.Ed.2d 656.

> "The interests underlying these three protections are quite similar. When a defendant has been once convicted and punished for a particular crime, principles of fairness and finality require that he not be subjected to the possibility of further punishment by being again tried or sentenced for the same offense. *Ex parte Lange,* 18 Wall, 163, 21 L.Ed. 872 (1874); *In re Nielsen,* 131 U.S. 176, 33 L.Ed. 118, 9 S.Ct. 672 (1889). When a defendant has been acquitted of an offense, the Clause guarantees that the State shall not be permitted to make repeated attempts to convict him, 'thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' *Green v. United States,* 355 U.S. 184, 187–188, 2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119 (1957). "The policy of avoiding multiple trials has been regarded as so important that exceptions to the principle have been only grudgingly allowed. * * *

> \* \* \* \* \* \*

> "By contrast, where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended. * * * "

In a recent case from this court, those principles were recognized but in a concept involving victimless narcotics crimes of two offenses within a single transaction. *Jers-*

---

**6.** A study of the problem made in the world of academia discloses this mind-boggling situation. See Cohen, *Commonwealth v. Hermankevich,* Section (B) of the Pennsylvania Deadly Weapons Act, and Multiple Punishment, 31 U.Pitt.L.Rev. 476 (1970); McElroy, Double Jeopardy: The Ephemeral Guarantee, 5 Crim.L.Bull. 375 (1969); Case Comment, 43 Notre Dame Lawyer 1017 (1968); McCleskey, The Dual Meaning of One Offense, 20 Baylor L.Rev. 218 (1968); Grinberg, Double Jeopardy: Its History, Rationale and Future, 70 Dick.L. Rev. 377 (1966); Comment, Twice in Jeopardy, 75 Yale L.J. 262 (1965); Note, Consecutive Sen-

tences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916 (1958); Statutory Implementation of Double Jeopardy Clauses: New Life for a Moribund Constitutional Guarantee, 65 Yale L.J. 339 (1956); Lugar, Criminal Law, Double Jeopardy and Res Judicata, 39 Iowa L.Rev. 317 (1954); Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 513 (1949); Note, Double Jeopardy and the Multiple-Count Indictment, 57 Yale L.J. 132 (1947). For a case containing exhaustive research on the subject, see *People v. De Sisto,* 1961, 27 Misc.2d 217, 214 N.Y.S.2d 858, though not here in point.

*key v. State*, Wyo.1976, 546 P.2d 173, applying a merger principle, beginning at page 183. In cases such as that before us now, with one episode and five victims, the courts seem to have drawn a distinction. Merger is not applied as a test. *Jerskey* is also settling for our purposes here in that it acknowledges that multiple charges may be brought when they,

" ' * * * are of the same or similar character or are based on the same act or transaction, or on two or more acts or transactions connected together or constituting part of a common scheme or plan.' " [Rule 11(a), W.R.Cr.P.]

and may be joined for trial under Rule 12, W.R.Cr.P.,[7] because they could be joined under Rule 11, W.R.Cr.P.

■ There are here separate crimes that have been charged and proven. All arise from the same event but each involves a separate victim and courts are protective of the individual citizen subjected to the criminal conduct of another. We have compiled cases in which there were separate charges, entangling more than one citizen victim, arising out of one occurrence in which courts have held there to be no double jeopardy and imposed multiple punishments, in some cases concurrent and in others consecutive or by combinations of those sentencing techniques. The precise question is addressed to the asserted error of failure of the trial court to dismiss all or part of the counts on the grounds of double jeopardy and fair trial.

In *State v. McCarroll*, La.1976, 337 So.2d 475, the defendants entered a cafe, armed with automatic shotguns, brandished their weapons and warned that anyone who moved would be killed. Each defendant was charged with one count of assault for each victim present. Multiple, consecutive sentences were imposed at trial level. Held, that the purpose of the aggravated assault statute expressed the legislature's

aim to protect each citizen from defined criminal conduct and intended to create multiple offenses from a single act affecting more than one person. Comparing the Wyoming statute to the Louisiana statute, we find the same intent in § 6–70B, under which defendant was prosecuted:

"Whoever, while armed with a dangerous or deadly weapon, including an unloaded firearm, maliciously perpetrates an assault or an assault and battery upon *any human being*, shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned in the penitentiary not more than fourteen (14) years, or both." (Emphasis added.)

It must be noted that "any human being" is in the singular and there is no indication that the defendant can get a bargain rate if he assaults a group of human beings.

In *People v. Wieckert*, Colo.1976, 554 P.2d 688, the defendant fired four shots in the direction of a patrol car where several officers and the defendant's wife and daughter were standing so he claimed the evidence showed only one criminal act. The court ruled that a defendant who commits an act of violence with the intent to place more than one person in fear of serious bodily injury or who recklessly creates a substantial risk of bodily injury to more than one person may be found guilty of multiple offenses under the same criminal statute.

The same theme was followed in *State v. Bradley*, 1974, 215 Kan. 642, 527 P.2d 988, where the defendant held two police officers at bay with a firearm during one encounter. Consecutive sentences were held to be appropriate. In *State v. Church*, 1949, 231 N.C. 39, 55 S.E.2d 792, several persons were seated in a parked automobile, at which defendant fired several shots, several entering the automobile. The court concluded that an indiscriminate assault upon several individuals is an assault upon each one of them and individual indictments,

---

7. Rule 12, W.R.Cr.P., provides that:
 "The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants, if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."

charging assault with intent to kill, were properly consolidated for trial.

There are many cases holding that killing by culpable negligence several human beings in one automobile accident constitutes as many separate offenses as there are victims and consecutive sentences are proper. Examples are: *State v. Whitley,* Mo.1964, 382 S.W.2d 665 (three persons killed, extensive authority cited, the court declaring the killing of a human being is the gravamen of the offense of manslaughter); *State v. Fredlund,* 1937, 200 Minn. 44, 273 N.W. 353, 113 A.L.R. 215 (two persons killed, two counts); *Lawrence v. Commonwealth,* 1943, 181 Va. 582, 26 S.E.2d 54 (two persons killed, two counts); *Holder v. Fraser,* 1949, 215 Ark. 67, 219 S.W.2d 625 (three persons killed, three counts); *Murray v. United States,* D.C.App.1976, 358 A.2d 314 (gravamen is killing a human being; drunken defendant had head-on collision, killing two persons, two counts, two consecutive sentences).

In *State v. Shaw,* Fla.App., 1969, 219 So.2d 49, the defendant shot and killed a pregnant woman, the effect of which was to kill the unborn child. The court considered the offenses of assault and murder distinct and separate. A unique situation appears in *People v. Gaither,* 1959, 173 Cal. App.2d 662, 343 P.2d 799, cert. den. 362 U.S. 991, 80 S.Ct. 1082, 4 L.Ed.2d 1023, where the defendant was charged and prosecuted for seven violations of a statute proscribing the administration of poison with the intent to kill. The defendant mailed a box of candy to one member of a family, whom he had threatened to kill, expecting it to be distributed among and eaten by a family of seven people. Defendant was held chargeable with seven violations of a statute proscribing the administration of poison, notwithstanding the fact that there was only one act of mailing the poisoned candy. See also *Smith v. State,* 1974, 23 Md.App. 177, 325 A.2d 902 (mass holdup, 117 counts, 25 individual people and one corporation, victims).

▮▮ As a general proposition, with few exceptions, in crimes against the person, when contrasted with crimes against property, there are as many offenses as individuals affected. *State v. Gratz,* 1969, 254 Or. 474, 461 P.2d 829 (two persons robbed at same time and place). In crimes of violence, a single act constitutes a separate offense against each person injured by the act. *People v. Gaither,* supra. There is a natural inclination to attach greater gravity to imperiling the lives of several persons than to threaten the life of one. *Holder v. Fraser,* supra. The Oklahoma Court of Criminal Appeals has announced that where crimes against the person are involved, even though part of the same transaction, they are separate and distinct crimes when directed at separate and distinct persons, temporal or spatial proximity being immaterial. *Jennings v. State,* Okl.Cr.1973, 506 P.2d 931. See also *Mutschler v. State,* Alaska 1977, 560 P.2d 377.

In practically all of the above cases, the results reached were on the basis of statutory construction, the legislative act being considered as for the protection of individual persons. An example of how a legislature can control multiple prosecutions is found in *People v. Golson,* 1965, 32 Ill.2d 398, 207 N.E.2d 68, cert. den. 384 U.S. 1023, 86 S.Ct. 1951, 16 L.Ed.2d 1026, reh. den. 385 U.S. 892, 87 S.Ct. 21, 17 L.Ed.2d 125. As a result of multiple homicides in a single transaction, the defendants were charged, tried, found guilty and sentenced as to one person killed. They were then again prosecuted and sentenced for the second killing. The Illinois legislature had adopted the following statutory provision:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.

"(b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection

(c), if they are based on the same act.[8]

\* \* \* "

The second prosecution was set aside under part (b).

The Supreme Court of the United States has dealt with the matter of statutory construction as related to multiple offenses under a single statute in *Ladner v. United States,* 1958, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199. The defendant took a shot at two federal officers with a shotgun, wounding both, and upon a verdict of guilty on two counts, was sentenced by the trial judge to consecutive terms of 10 years each. One conviction was reversed. The Court did not decide the case upon constitutional grounds but decided that the congressional intent was not clear that the statute should cover multiple government officer victims assaulted by one act and could mean that if a gun was pointed at five officers without being fired, there could be a 50–year sentence even though no one was hurt and if Congress wanted that result, it should have said so. The opinion ends on an indecisive note because it was remanded for further proceedings to determine whether more than one shot was fired, as obliquely indicated, but did not say what would happen if that turned out to be the case, as here, where several shots were fired. We do not here have the problem of *Ladner* because the Wyoming statute is clear that it applies to an assault of "any human being" and several shots were fired. As previously indicated, many courts share such a view. Other courts mention and distinguish *Ladner,* for example, see *Murray v. United States,* supra, and *State v. McCarroll,* supra. To those may be added a case, not here previously cited, another vehicular killing of three persons, *State v. Miranda,* 1966, 3 Ariz.App. 550, 416 P.2d 444, the court saying that it is the intent of the legislature which controls and there is no constitutional prohibition against legislation which provides for multiple crimes arising from single acts against multiple victims. There is

hardly a point to stop, the authority being so gargantuan on the subject.

▪ The defendant cites to us and the trial judge referred to it as well at the time of sentencing, to justify holding there to be only one offense, the case of *Ashe v. Swenson,* 1970, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469. Both misconceive its thrust and holding. In *Ashe,* six men were engaged in a poker game. The defendant there, one of three or four robbers, robbed each of the poker players. The defendant Ashe was tried and acquitted of robbing Donald Knight, one of the poker players. Six weeks later, Ashe was tried on a separate charge of robbing another participant in the poker game, a victim by the name of Roberts, and found guilty. The Supreme Court held there was double jeopardy simply because on a theory of collateral estoppel, an issue of ultimate fact had once been determined by the judgment of acquittal as to the robbery of Knight and that issue could not again be litigated between the defendant and the State in a future case between the same parties. Justice Stewart, author of the opinion, distinguished that case very effectively from the one now before us when at 397 U.S. at 446, 90 S.Ct. at 1195, 25 L.Ed.2d at 477, he said:

> "The question is not whether Missouri could validly charge the petitioner with six separate offenses for the robbery of the six poker players. It is not whether he could have received a total of six punishments if he had been convicted in a single trial of robbing the six victims. It is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the State could constitutionally hale him before a new jury to litigate that issue again."

To try the separate counts against the defendant in separate trials is wherein the evil rests. As said by Justice Brennan in his concurrence at 397 U.S. at 453–454, 90 S.Ct. at 1199, 25 L.Ed.2d at 481, the double jeopardy clause:

---

**8.** Taken from § 1.07(2), Model Penal Code, ALI Master Edition 1974. That full section, along with §§ 1.08 and 1.09, deal with multiple prose-

cutions arising out of the same act or a continuing course of conduct.

" * * * requires the prosecution, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction. This 'same transaction' test of 'same offence' not only enforces the ancient prohibition against vexatious multiple prosecutions embodied in the Double Jeopardy Clause, but responds as well to the increasingly widespread recognition that the consolidation in one lawsuit of all issues arising out of a single transaction or occurrence best promotes justice, economy, and convenience. Modern rules of criminal and civil procedure reflect this recognition. * * * "

The double jeopardy is in the successive trial feature—not trying all offenses at once. The defendant can run the gauntlet of all related offenses in a single trial, as here done.

We can do no better in closing the discussion and before reaching our holding on the issue, than to quote former Chief Justice Traynor of the California Supreme Court in *Neal v. State,* 1960, 55 Cal.2d 11, 20, 9 Cal.Rptr. 607, 612, 357 P.2d 839, 844, cert. den. 365 U.S. 823, 81 S.Ct. 708, 5 L.Ed.2d 700:

" * * * A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person.[9] * * * "

We are consequently satisfied and hold that there could have been no prejudice in charging, trying, submitting to the jury, receiving the five verdicts and sentencing on only one,[10] the assault upon Patty Gill.

Defendant's third and final point is that the trial court's Instruction Number 9,[11] "coupled with multiple counts, overcame reasonable doubt and lack of evidence as to one or more counts and essential elements therein and deprived appellant of his presumption of innocense [sic] and shifted the burden of proof to the detriment of a fair trial." In *Stuebgen v. State,* Wyo.1976, 548 P.2d 870, cited as authority, an identical instruction was held improper.

Steubgen and Roelfson were charged with intent to deliver a controlled substance. It was a case in which specific intent must be proven as an essential element of the crime and the instruction, as there used, was by this court considered as having the effect of advising the jury that intent to deliver could be presumed and

9. In *Ladner v. United States,* supra, a line of argument was initiated which has been turned into an absurdity by some courts and the defendant here: "under a multiple punishment concept, absent some legislative intent to the contrary, an accused could fire two shots toward the spectators at a football game, harming no one and face a thousand years imprisonment." Such argument ignores the constitutional protections against cruel and unusual punishment, it ignores that a life sentence is the maximum possible under human mortality, the age of the accused and protections against abuse of discretion. With a judicious use of concurrent sentences or a combination of consecutive and concurrent sentences, a suitable sentence can be tailored to fit the crime and the defendant, taking into consideration all those matters associated with sentencing. We cannot assume that our trial judges are fitted with heads filled with fluff.

10. At the time of sentencing in open court the trial judge announced that he was only sentencing the defendant on the one count in which Patty Gill was the victim, though not so stated in the judgment and sentence.

11. Instruction No. 9 is as follows:

"The Court instructs the jury that as to the matter of intent we have no power to ascertain the certain condition of a man's mind. The best we can do is to infer it more or less satisfactorily from his acts. A person is presumed to intend what he does. A man who performs an act which it is known will produce a particular result, is from our common experience presumed to have anticipated that result and to have intended it.

"The intent with which an act is done is an act or emotion of the mind seldom if ever capable of direct and positive proof, and it is to be arrived at by such just and reasonable deductions or inferences from the acts and facts proved as the guarded judgment of a candid and cautions [sic] man would ordinarily draw therefrom."

thereby deprived the jury of its fact-finding function on the element of intent, relieved the State of proving specific intent and overcame defendant's presumed innocence.

 *Steubgen* was a specific intent case; the case before us is a general intent case. In the *Steubgen* case, there never was a delivery of the drug. In the case before us, the assault was accomplished— the crime was complete when defendant shot several holes into the automobile occupied by his victims. *Steubgen* specifically distinguishes at 548 P.2d 879, the two types of crimes—one, an intent to commit another, and the other, such as here, where the crime intended is actually committed.

The instruction was appropriate in the case before us because men usually intend to do what they do and it was done here. This is particularly so in this case because the intent element is by the pertinent statute couched in "malice." Section 6–70B defines the crime, using a derivative of that word as follows:

> "Whoever, while armed with a dangerous or deadly weapon, * * * *maliciously* perpetrates an assault or an assault and battery upon any human being, * * *." (Emphasis added.)

shall be punished as prescribed. The trial judge instructed on malice.[12] As said in *Ballinger v. State,* Wyo.1968, 437 P.2d 305, 309, "Use of a deadly and dangerous weapon in a deadly and dangerous manner raises a presumption of malice," citing *State v. Morris,* 1929, 41 Wyo. 128, 283 P. 406, 411. The defendant offered nothing to rebut such a presumption but stood on alibi. Shooting at a car full of people presumes malice. There was no error in the court's instructions.

We must and do affirm.

---

**12.** While we are not called upon to approve or disapprove the instruction, it was as follows:

"To explain further the meaning of the word 'malicioulsy' [sic] as used in these instructions, the Court instructs you that malice is not confined to ill will towards an individual, but is intended to denote an action flowing from any wicked and corrupt motive. A thing done with a wicked mind and attended with such circumstances as plainly indicate a heart regardless of social duty and fully bent on mischief, indicates malice within the meaning of the law; hence, malice may be found from any deliberate and cool act against another, however sudden, which shows an abandoned and malignant heart."

ROSE, Justice, specially concurring, with whom McCLINTOCK, Justice, joins.

As I have said in *Richmond v. State,* Wyo., 554 P.2d 1217, reh. den. 558 P.2d 509; *Dodge v. State,* Wyo., 562 P.2d 303; and again in *Raigosa v. State,* Wyo., 562 P.2d 1009, I am unalterably opposed to this court's dismissing, without authority or license, the properly preserved Federal Constitutional appellate grounds of criminal defendants.

I will not again concur in any opinion that does this—at least until the writer can cite acceptable authority for the proposition that it is within our power to so act.

I therefore concur in the result only in the instant matter—not in the way it is reached.